THE MABEL, her Tackle, etc.  (Three Cases.)

(*District Court, D. California.*  December 15, 1884.)

SALVAGE SERVICE—BARKS IN ICE—COMPENSATION.

The whaling-bark Eliza became involved in the ice in the Arctic ocean near the Sea Horse islands in September, 1884, and her crew, after seven or eight days passed on the ice in trying to reach shore, returned to her. The bark Mabel had met with the same misfortune five or six miles from the Eliza, and had been abandoned by her crew, who succeeded in reaching the shore. A party of 16 seamen and a mate was sent to the Mabel on September 27th to obtain provisions, etc., to enable the crew to subsist through the winter. They remained on the Mabel over night, intending to return to the Eliza in the morning, but during the night the ice broke up, and they could not return. The barks, during the next day, drifted out of sight of each other. The Mabel was, with considerable risk and difficulty, navigated to Behring's straits *en route* for San Francisco, where, after three or four days, she fell in with the bark Rainbow, from which she obtained a chronometer, necessary clothing for the men, and the services of the fourth mate to assist in navigating her to San Francisco, where she arrived after a voyage of 38 days. The Eliza, which had escaped, preceded her by a few days. *Held* that, from the time they fell in with the Rainbow, their services in bringing the bark to San Francisco and restoring her to her owners was a salvage service, but that, under the circumstances, it was not a service of a high degree of merit, and that there should only be allowed to the seamen $50 each, to the mate of the Eliza and of the Rainbow $150 each, and to the Rainbow $100, with the amount of her bill of supplies.

*W. H. Cook*, for libelants, O. Serodino and others.

*Milton Andros*, for libelants, W. H. Walston and others.

*Daniel T. Sullivan*, for libelant R. A. Reed.

*Page & Eells*, for claimants.

HOFFMAN, J.  In the month of September last, towards the close of the whaling season, the bark Eliza, while endeavoring to make her way out of the Arctic ocean, became involved in the ice in the vicinity of the Sea Horse islands.  At the distance of from five to six miles from her was the bark Mabel, which, having been overtaken by a similar misfortune, had been abandoned by her crew, who, as was afterwards ascertained, had succeeded in reaching the shore.  The master of the Eliza, renouncing all hope of extricating his vessel, attempted to secure the safety of himself and his crew by the same expedient.  After some seven or eight days passed on the ice, and in endeavoring to find clear water, the party (with the exception of four of the number) "seeing no hope ahead," returned to the Eliza.  Four of the seamen were so disabled by swollen feet and fatigue that they took refuge on board the deserted Mabel.  The master, believing that his only chance of safety lay in being able to survive the rigors and dangers of an arctic winter on board his own vessel, promptly addressed himself to making such preparations for his long imprisonment as were possible.  With this view a party was sent to the Mabel to bring from her such provisions as could be transported.  On their return the men asked permission to make a second trip for the same object.  This having been given, they started for the Mabel on

the afternoon of September 27th, intending to remain on the Mabel all night and to return to the Eliza in the morning. During the night noises were heard, which appeared to indicate that the ice was moving or breaking up, and in the morning they found that the ice had broken up between the Mabel and the Eliza, and that between the two vessels a lane of broken ice and water had opened. As they had no boats, their return to the Eliza was hopelessly cut off. The two vessels were still in sight of each other, but as the day wore on they continued to drift in opposite directions, and towards night-fall were out of sight of each other. During the next day the Mabel remained fast in the ice, but on the day after, the men, 19 in number, under the orders of Mr. Reed, first mate of the Eliza, succeeded, after unshackling the chains of her anchors, etc., in navigating her into clear water. Her course was then directed to Behring's straits, *en route* for San Francisco, but the navigation was not unattended with risk, as she had no chronometer, and Mr. Reed's acquaintance with navigation was, as he himself admits, "limited." Some three or four days afterwards, when the Mabel had reached Behring's straits, she fell in with the bark Rainbow, from which she obtained a supply of clothing for the men, of which they stood in need, a chronometer, and the services of Mr. Walston, fourth mate of the Rainbow, who joined the Mabel to assist Mr. Reed in navigating her to San Francisco, where she safely arrived after a voyage of 38 days. The Eliza, which had also effected her escape, had preceded her by a few days.

It was not denied at the bar that the service performed by Mr. Reed and his men constituted a salvage service. Whatever weight should be given to a consideration of the motives with which they originally went on board the Mabel, and of the circumstances which prevented their return to their own ship and compelled them to risk their lives upon the chance of saving the Mabel, yet from the moment when, by falling in with the Rainbow, on board of which they safely would have been secured, their service in bringing the vessel to this port, and restoring her to her owners, was unquestionably a salvage service; but it was not, in my opinion, a service of a high degree of merit. When the salvors went on board the Mabel they had no thought whatever of saving her. The sole object was to add to their chances of surviving the rigors of an arctic winter, which they had then no hope of escaping, by replenishing the stores of the Eliza. Mr. Reed declares very emphatically that he would have returned to the Eliza had it been practicable. That they saved the Mabel, and that but for them she would have been lost, is undeniable. But they saved her under circumstances which, without the exercise of any volition on their part, had indissolubly bound up the preservation of their own lives with the safety of the vessel. Their conduct up to the time of making the Rainbow must have been the same, though they had known they were not to receive any pecuniary recompense whatever.

The case of *The Two Friends,* 2 Wm. Rob. 349, has been referred

to as bearing, in some of its details, a close resemblance to the case at bar. In *The Two Friends* the salvors had been obliged to abandon their own vessel, which had struck upon a reef, and they were making for the island of Cuba in the long-boat or jolly-boat, "having secured a sufficiency of provisions, some sails, and a compass, and having further provided themselves with two coils of rope, for the purpose of saving their lives." When about 35 miles from Havana they fell in with the Two Friends, which had also struck upon a reef, and had been abandoned by her crew. She was at once boarded by the salvors, who, after weighing her anchors and throwing overboard a part of her cargo, "succeeded in getting the vessel to sea, pursuing a course towards England, because they had no information as to the destination of the vessel, and from the description on her stern they were led to suppose that she belonged to the island of Jersey." The vessel reached Dartmouth after a voyage of from 25 to 30 days. The value of the property was £1,237. The court allowed £300. In the protest it is stated that they acted "for the benefit of the ship and cargo, and of all persons interested in the same, and for the preservation of their own lives." The case does not disclose what were the circumstances which constituted the danger to the lives of a boat's crew provided with sails, provisions, and a compass in a tropical sea, and 35 miles distant from Havana. But admitting that the desire to secure their own safety in some degree influenced their conduct, it is, I think, evident that the service was substantially a salvage service, wholly unlike the involuntary and compulsory service performed by the libelants in getting the Mabel out of the ice and taking her to Behring's straits.

The appraised value of the property saved is $5,392.25. But from this must be deducted the sum due the Rainbow for the clothes furnished the salvors. Mr. Walston, fourth mate of the Rainbow, must, I think, be considered a co-salvor. The large number of the salvors (19, not including the mate) will reduce the amount of their distributive shares. But I do not feel at liberty, on that account, to enhance the estimate of the value of the service. Eight or nine men would have been abundantly sufficient for the navigation of the vessel. The large number on board must have sensibly diminished the arduousness of their labors. At the time the master of the Rainbow permitted Mr. Walston to go on board the Mabel, the cruise of the former vessel had not been finished. She proposed to continue it for a week or 10 days longer. By parting with her fourth mate she not only lost his services, but by his absence one of her four boats became unavailable. In point of fact she took no more whales, but, had any been sighted, the absence of Mr. Walston might have occasioned a serious loss. I think the Rainbow is entitled to some compensation.

I think myself justified in slightly exceeding the percentage on the value of the property saved, allowed by Dr. Lushington in *The Two*

*Friends*, in view of the high rate of wages which obtains on this coast as compared with that prevailing in England 40 years ago. Had the imminent peril to which the salvors were exposed been voluntarily encountered in a gallant attempt to save the lives or property of others, I should have been greatly influenced by it. I shall allow to each of the seamen the sum of $60; to Mr. Reed and Mr. Walston $150 each; and to the Rainbow $100, together with the amount of her bill for supplies. The costs to be paid by the claimants.